**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TYRELL WOODRUFF,

              *Plaintiff*,

     v.

UNITED STATES OF AMERICA,

              *Defendant*.

Civil Action No. 16-1884 (RDM)

**<u>REDACTED MEMORANDUM OPINION</u>**

       Plaintiff Tyrell Woodruff, a former federal inmate, brings this Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 2671 *et seq.*, action against the United States.  Dkt. 52.  He alleges that,

while he was incarcerated at the Gilmer Federal Correctional Institution ("FCI Gilmer"), another

inmate assaulted him with a knife in the recreation yard.  *Id.* at 3 (2d Am. Compl. ¶ 9).  Seeking

to recover damages for his injuries, Woodruff alleges that the officials at FCI Gilmer negligently

operated the recreation yard's turnstile, thus permitting the assailant to enter with a knife; failed

to supervise the recreation yard; failed to intervene and to stop the attack; and, despite having

been close enough to see and to hear the assault, delayed responding to the attack by 20 to 25

minutes, during which time Woodruff bled profusely.  *Id.* at 3–4 (2d Am. Compl. ¶¶ 9, 11, 14–

16).  The United States moves to dismiss the second amended complaint, arguing that the Court

lacks subject-matter jurisdiction because the challenged conduct falls within the discretionary

function exception to the FTCA.  Dkt. 53.

       For the reasons explained below, the Court will **GRANT** in part and **DENY** in part the

government's motion to dismiss.

## I. BACKGROUND

Unless otherwise indicated, the following facts are derived from Woodruff's second amended complaint and, for the purposes of the pending motion to dismiss, are taken as true. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Woodruff is a former prisoner who was incarcerated at FCI Gilmer.  Dkt. 52 at 2 (2d Am. Comp. ¶¶ 3, 5).  On January 13, 2015, while Woodruff was incarcerated at FCI Gilmer, he entered the recreation yard and "noticed that there were no correctional officers at the turnstile entrance to the yard."  *Id.* (2d Am. Compl. ¶ 8).  After entering the recreation yard, another inmate attacked Woodruff using a "a home-made knife."  *Id.* at 3 (2d Am. Comp. ¶ 9).  "After a struggle, [he] was able to wrest the knife from his unknown assailant, who then fled."  *Id.* at 3 (2d Am. Compl. ¶ 10).  As a result of the attack, Woodruff sustained a "wound on [his] scalp that required twelve sutures to close," *id.* at 3 (2d Am. Compl. ¶ 9), "four or five additional puncture wounds, as well as abrasions on his head," *id.* at 3 (2d Am. Compl. ¶ 12), and "lost a substantial amount of blood," *id.*

Woodruff brings a claim for negligence against the United States, *id.* at 6 (2d Am. Compl. ¶ 26), and identifies three separate acts or omissions by FCI Gilmer staff that form the basis of that claim.  He alleges, first, that correctional officers at FCI Gilmer failed "to operate the turnstile at the entrance of the recreation yard" and thus "allowed prisoners, including [his] assailant, to freely bring weapons [into] the yard."  *Id.* at 4 (2d Am. Compl. ¶ 16).  Second, he alleges that, "despite being in a position to see and hear [the] attack," the correctional officers "paid no apparent attention to the long-lasting and potentially deadly attack on [him]."  *Id.* (2d Am. Compl. ¶ 15).  Third, he alleges that "[i]t took about 20–25 minutes for correctional officers to respond to [him] following the attack," during which time he bled "profusely from his scalp

wound," and that the officers only came to his assistance during a "routine yard closing prior to the 4:00 [p.m.] prisoner count." *Id.* (2d Am. Compl ¶ 14). These failures, Woodruff alleges, proximately caused his injuries, and he seeks to recover $500,000 in damages for pain and suffering. *Id.* at 6 (Prayer for Relief).

After Woodruff filed suit, the United States moved to dismiss his original complaint, arguing that the Court lacked subject-matter jurisdiction because the challenged conduct falls within the discretionary function exception to the FTCA's waiver of sovereign immunity. Dkt. 13. The Court denied that motion as premature, afforded Woodruff an opportunity to conduct limited jurisdictional discovery, Dkt. 19 at 6, and later granted him leave to file an amended complaint, Minute Entry (Feb. 28, 2019). The United States now moves to dismiss the second amended complaint, again pressing the argument that the discretionary function exception bars this suit. Dkt. 53.

## II.  LEGAL STANDARD

A court must dismiss a case pursuant to Rule 12(b)(1) if it lacks subject-matter jurisdiction. In determining whether it has jurisdiction, a court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). Courts must construe the complaint "with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). But, when the defendant raises a factual challenge to the jurisdictional allegations contained in the complaint, the Court may go beyond the four corners of the complaint and weigh conflicting evidence to determine if it has

jurisdiction.  *See Phoenix Consulting Inc., v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Herbert*, 974 F.2d at 197.   If the Court "determines that it lacks subject matter jurisdiction, it can proceed no further."  *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997) (citations omitted).

## III.  ANALYSIS

The United States argues that each of the alleged omissions that Woodruff challenges falls within the FTCA's discretionary function exception.  *See* Dkt. 53 at 12–21.  Woodruff, in turn, disputes that the discretionary function exception applies.  Dkt. 55.  As explained below, the Court concludes that (1) there is evidence that the discretionary function exception does not apply to Woodruff's claim that the officers failed to operate the turnstile at the entrance of the recreation yard, (2) Woodruff has plausibly alleged that the failure to intervene constituted an Eighth Amendment violation, and, as a result, that conduct is not shielded by the discretionary function exception, and (3) Woodruff's remaining claims are subject to the discretionary function exception and thus lie beyond this Court's jurisdiction.  As a result, the Court will **GRANT** in part and **DENY** in part the government's motion to dismiss.

### A.    Discretionary Function Exception

Sovereign immunity is "jurisdictional in nature" and, "[a]bsent a waiver, . . . shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  The FTCA waives the sovereign immunity of the United States for damages claims "arising from certain torts committed by federal employees in the scope of their employment."  *Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001);

*see* 28 U.S.C. § 1346(b)(1).  This waiver, however, is subject to several exceptions.  *See* 28 U.S.C. § 2680.  The exception at issue here—the discretionary function exception—applies to "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  If conduct falls within this exception, the United States remains immune from suit, and the Court lacks jurisdiction over the claim.  *See Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) ("Discretionary function determinations are jurisdictional in nature.").

A two-part test guides the Court's assessment of whether the discretionary function exception applies.  *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991).  The Court must first decide whether a "federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow."  *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  If so, the discretionary function exception will not shield the United States from suit because "the employee has no rightful option but to adhere to the directive."  *Id.* (quoting same). If, however, "the challenged conduct involves an element of judgment," the Court must then determine "whether that judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* at 322–23 (quoting same).  The purpose of the exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984).  The exception, accordingly, "protects only governmental actions and decisions based on considerations of public policy."  *Berkovitz*, 486 U.S. at 537.

1.      *Discretionary Act Prong*

At step one of the discretionary-function test, the Court must ask whether a "statute, regulation, or policy" directs a government employee to conduct himself in a particular way.  *Id.* at 536.  The government argues that "no specific statutes, regulations, or procedures" specified a prescribed course of action relevant to Woodruff's claims.  Dkt. 53 at 15–16.  Woodruff disagrees and argues that step one is satisfied because the post orders at FCI Gilmer left the correctional officers with no discretion regarding how to respond to the attack.  *See* Dkt. 55 at 14–19.  Having reviewed the post orders and other evidence in the record, the Court concludes that, although Woodruff has not alleged any claims arising from non-discretionary duties contained in the post orders, it is plausible that the correctional officers at FCI Gilmer had a non-discretionary duty to ensure that prisoners, including Woodruff's assailant, pass through metal detectors at the entrance of the recreation yard.

"Post orders" are government policies "adopted by individual correctional institutions" that "govern the conduct of corrections officers while they serve at a particular post within the institution."  *Sledge v. BOP*, No. 12-5287, 2013 U.S. App. LEXIS 25940, at *7 (D.C. Cir. Dec. 13, 2013).  The post orders at issue here "cover a wide range of topics," including "the proper way for a member of the Perimeter Patrol Team to begin his or her shift at the facility;" "the radio frequency to monitor for information;" and "the proper way to maintain equipment, including among others, weapons maintenance."  Dkt. 55 at 15–16.  Woodruff argues that, because the post orders specify how correctional officers should discharge their duties— including "the proper way . . . to begin his or her shift at the facility," "the proper way to complete and sign out of a shift," and "the requirements to report information to the Control

Center"—they establish a set of mandatory commands the officers were required to follow here.
Dkt. 55 at 15–18.

Although Woodruff is correct that the post orders establish certain non-discretionary
duties, he fails to identify any such duty that relates to the omissions that Woodruff contends led
to his injuries.  Absent that nexus, the post orders have no bearing on the applicability (or
inapplicability) of the discretionary function exception.  *See Sledge*, 2013 U.S. App. LEXIS
25940, at *7; *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) ([T]he discretionary
function exception requires that an inquiring court focus on the specific conduct at issue.").
Here, only two post orders are even arguably relevant: ███████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████  Dkt. 56 at 4.  Woodruff, however, has not alleged that the officers failed to
perform either of those acts.

Although the first duty might have been relevant had Woodruff alleged that his injuries
arose from the officers' failure to patrol, *see, e.g.*, *Garza v. United States*, 161 F. App'x 341, 344
(5th Cir. 2005) (concluding that a guard had "no discretion to avoid patrolling [a] recreation
yard" because the prison's post orders unambiguously directed that he patrol the area), he has not
done so.  To the contrary, he alleges that he saw "the officer or officers assigned to a vehicle to
patrol the perimeter of the yard by the fence," Dkt. 52 at 3 (2d Am. Compl. ¶ 11)—that is, he
alleges that the officers *were* patrolling the perimeter but that they failed to respond to the attack.
As a result, Woodruff cannot rely on the duty to patrol the perimeter.  *See Shuler v. United
States*, 531 F.3d 930, 934 (D.C. Cir. 2008) (holding that, under the FTCA, a district court has
subject-matter jurisdiction only if the plaintiff's complaint sets forth facts sufficient to

demonstrate that the government employee whose conduct caused him harm violated a specifically prescribed policy).

With respect to the second duty, the government does not dispute that ███████████ ████████████████████████████████████████████████ Dkt. 56 at 4; *see also Sledge*, 2013 U.S. App. LEXIS 25940, at * 7 ("[C]onduct is not protected when it contravenes specific and unambiguous directives."). Nor does the government dispute that the attack at issue constituted the type of "unusual activity" that the officers were required to report without delay. But Woodruff, again, fails to allege that his injuries resulted from a failure to comply with the post order. *See* Dkt. 57 at 15. Although Woodruff argues in his opposition brief that the post order required the officers immediately to report the assault, Dkt. 55 at 18, his complaint is silent on the matter. He alleges only that the "officers assigned to provide supervision to the recreation yard . . . failed to perform their required duties to supervise and maintain order," failed "to intervene to prevent harm," and delayed 20 to 25 minutes before responding and helping him obtain medical care. Dkt. 52 at 4–5 (2d Am. Compl. ¶¶ 14, 15, 21). Because Woodruff's claims do not turn on any alleged failure to report the attack to the Control Center, and because he may not amend his complaint or supplement his claims through his opposition brief, *see Klein v. Am. Land Title Ass'n*, 926 F. Supp. 2d 193, 201 (D.D.C. 2013) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *McManus v. District of Columbia*, 530 F. Supp. 46, 74 n.25 (D.D.C. 2007)), the non-discretionary reporting duty cannot sustain the Court's jurisdiction.[1]

---

[1] Woodruff was no longer proceeding *pro se* at the time the second amended complaint was filed, *see* Minute Order (May 16, 2018) (appointing counsel), so he is not entitled to the additional leeway accorded *pro se* litigants, *cf. Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987) ("The Court is mindful that a *pro se* litigant's complaint is held to a less stringent standard than formal pleadings drafted by lawyer."). Moreover, the second amended complaint was filed

To the extent Woodruff argues that the post orders established a non-discretionary duty for the officers to intervene in the attack, moreover, that contention is belied by the record. Aside from requiring officers to report unusual activity, the post orders do not specify a particular course of action officers must follow upon detecting unusual activity. As a result, officers were left to exercise their professional judgment about when and how to respond to an incident. *See Sledge*, 2013 U.S. App. LEXIS 25940, at *7; *Montez v. United States*, 359 F.3d 392, 396 (6th Cir. 2004) (holding that, where a directive sets forth broad objectives but "does not specifically prescribe a course of action for prison officials to follow," officials have discretion on how to accomplish the objectives). The government, moreover, has submitted additional evidence supporting its contention that the officers had discretion to decide when and how to respond to the attack. In particular, the "Recreation Specialist" at FCI Gilmer, who was responsible for "overseeing all Recreation activities at FCI Gilmer's Camp facility," attests that he is "not aware of any mandatory directives regarding staff action in response to an ongoing altercation." Dkt. 53-2 at 1–2 (Heath Decl. ¶¶ 1, 5). Accordingly, the only evidence before the Court negates Woodruff's contention that the correctional officers were subject to a non-discretionary duty to intervene in the attack.

There is at least some evidence, however, that supports Woodruff's contention that the correctional officers failed to comply with one non-discretionary duty. According to Woodruff, the officers on duty failed "to operate the turnstile at the entrance of the recreation yard," and this omission "allowed prisoners, including [his] assailant, to freely bring weapons [into] the yard." Dkt. 52 at 4 (2d Am. Compl. ¶ 16). Although the post orders do not mention—much less

---

six weeks after the government produced the post orders to counsel, *see* Dkt. 53 at 9, and so the omission cannot be explained by counsel's lack of access to the relevant policies.

require—that the officers operate the "turnstile at the entrance of the recreation yard," *id.*, the government's own evidence at least hints at such a non-discretionary duty: according to the Heath declaration, "prior to entering or exiting [the recreation yard], inmates *must* go through metal detectors."  Dkt. 53-2 at 3 (Heath Decl. ¶ 6) (emphasis added).

Notably, the government does not dispute that inmates were required to go through metal detectors before entering the recreation yard or that the correctional officers had a non-discretionary duty to enforce that requirement.  Instead, it argues that Woodruff's claim does not arise from a failure to carry out that duty.  As the government puts it, Woodruff "does not allege that prison staff failed to operate the metal detectors on the date in question" but, rather, alleges only that "prison staff were not 'present' at the turnstile at the entrance of the recreation yard" when he entered and that Woodruff has "identified no policy or procedure mandating prison staff presence at the 'turnstile.'"  Dkt. 53 at 18.  What the Court cannot discern from the complaint, the Heath declaration, or any other portion of the record is whether the "turnstile" and the "metal detector" are the same thing—or at least operate in tandem at the entrance to the recreation yard—and whether, as the United States seems to suggest, it is possible to operate the metal detector without any staff "'present' at the turnstile."  *See* Dkt. 57 at 6.

Because, at this stage in the proceeding, the Court must draw all reasonable inferences in Woodruff's favor, *Settles*, 429 F.3d at 1106, and because the government acknowledges that all inmates were required to pass through the metal detector before entering the recreation yard, the Court will deny the government's motion to dismiss Woodruff's claim that he was assaulted because the turnstile was unstaffed on the day he was attacked.  *Cf. Wiggins v. Bledsoe*, No. 11-1298, 2017 WL 5900572, at *13 (M.D. Pa. Nov. 30, 2017) (holding that the discretionary

function exception did not apply to an officer's alleged failure to screen prisoners with a metal detector as the applicable post orders required).

2.    *Public Policy Prong*

Aside from the officers' failure to operate the turnstile, Woodruff's complaint can fairly be read to challenge (1) the officers' failure "to intervene [in the assault] to prevent harm to" Woodruff, Dkt. 52 at 5 (2d Am. Compl. ¶ 21), and (2) their 20- to 25-minute delay in responding to Woodruff following the attack, *id.* at 4 (2d Am. Compl ¶ 14).  Because there is no evidence that the officers had a non-discretionary duty to intervene in the attack or to assist Woodruff to obtain medical attention more quickly than they did, the Court must proceed to the second step of the discretionary function test.  *See Sledge*, 2013 U.S. App. LEXIS 25940, at *7

At step two, the Court must determine whether the discretion at issue is of the type "that the discretionary function exception was designed to shield."  *Id.* at *6.  "Decisions that require choice are exempt from suit . . . only if they are 'susceptible to policy judgment' and involve an exercise of 'political, social, [or] economic judgment.'"  *Barbosa v. DHS*, 263 F. Supp. 3d 207, 217 (D.D.C. 2017) (quoting *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995)).  Determining whether a decision involves an exercise of political, social, or economic judgment "is admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.'"  *Cope*, 45 F.3d at 448.  But, even if the "precise contours of [the] test are difficult to pin down," *Sledge*, 2013 U.S. App. LEXIS 25940, the case law has established some principles that guide the Court's analysis.

As a starting point, courts have recognized that, before determining whether the complained-of conduct was grounded in judgment or choice, it is crucial to determine exactly what conduct is at issue.  *See, e.g.*, *Gonzalez v. United States*, 851 F.3d 538, 545 (5th Cir. 2017);

*Merando v. United States*, 517 F.3d 160, 165 (3d Cir. 2008); *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997); *Autery v. United States*, 992 F.2d 1523, 1527–28 (11th Cir. 1993). Second, because "[d]iscretionary conduct is not confined to the policy or planning level," the exception can apply even to agency officials implementing day-to-day activities. *Gaubert*, 499 U.S. at 325; *see also Berkovitz*, 486 U.S. at 547 (analyzing whether the agency's policies allowed "room for implementing officials to make independent policy judgments").  Most importantly, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

Here, the government posits, and the Court agrees, that the conduct at issue is the officer's "decision of how and when to respond" to the alleged assault and resulting injuries. Dkt. 53 at 20.  Although the factual record provides little clarity on why the guards did not respond more promptly, Plaintiff does not dispute that the guards were present in the yard and close enough to see and hear the attack.  Indeed, when the Court inquired at oral argument whether Plaintiff wished to conduct discovery about whether the guards were present in the yard at the time of the attack, counsel affirmed that Plaintiff's factual theory is that guards were present in the yard, close enough to see and to hear the attack.  *See* Minute Entry (May 19, 2020); Dkt. 52 at 4 (2d Am. Compl. ¶ 15) (alleging that the officers were "in a position to see and hear [the] attack").  Because Plaintiff concedes that the guards were present and patrolling the perimeter, his theory of negligence cannot be based on the officers' complete dereliction of their duty to patrol, such that the so-called "negligent guard theory" might apply.  *Cf. Sledge v*, 2013 U.S. App. LEXIS 25940 (discussing the "negligent guard theory" and explaining that a hypothetical challenge to an officer's decision to "pack up early" might not be shielded by the

12

discretionary function exception because there "can never be a public-policy reason" for an

employee's decision to leave early); *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir.

2000) (holding that, where there are "numerous potential ways" in which a defendant's

negligence may have triggered the alleged injury, the nature of the asserted conduct is potentially

determinative of the applicability of the discretionary function exception).

Having concluded that Plaintiff's challenge is premised on the officer's decision on when

and how to respond to the attack, the Court has little doubt that it is the type of decision that falls

within the discretionary function exception.  The government has offered persuasive evidence

that, in general, decisions about when and how to respond to an ongoing attack are susceptible to

policy considerations, including the balancing of risk, safety, and the allocation of resources.

Heath attests that, during an "inmate fight," a staff member "would key up his or her institutional

radio and announce to control that there is an inmate fight," but "[u]nless another staff member is

directly involved in the altercation, the staff member announcing the incident would normally

wait until sufficient staff respond before trying to break up an altercation."  Dkt. 53-2 at 2 (Heath

Decl. ¶ 5).  "Each situation," he continues, "[is] handled on a case by case basis, given that the

specific circumstances of any particular incident are usually unique in some fashion."  *Id.*

Woodruff, in turn, offers no evidence to controvert the Heath declaration.  He merely

argues that the Heath declaration is of "little value" because Heath has opined only about "what

normally occurs [in] the recreation yard but has nothing to say about what actually happened on

the day in question."  Dkt. 55 at 5.  Woodruff is incorrect to suggest that the Heath declaration is

irrelevant.  In deciding whether a decision is susceptible to policy analysis, "[w]hat matters is not

what the decisionmaker was thinking, but whether the type of decision being challenged is

grounded in social, economic, or political policy."  *Macharia v. United States*, 334 F.3d 61, 67

(D.C. Cir. 2003).  The Heath declaration provides uncontroverted evidence that the decision concerning when and how to respond to an ongoing attack is susceptible to policy analysis.[2] Because it is precisely that type of decision that Woodruff is challenging, his argument with respect to this conduct fails at step two of the analysis.  *See Sherman v. Lew*, No. 17-12809, 2018 U.S. App. LEXIS 35146, at *13 (11th Cir. 2018) (observing that the decision on "how to break up a potentially deadly fight between prisoners and restore order seems to fit squarely within the discretionary function exception"); *Davis v. United States*, No. 10-05, 2010 WL 2754321, at *24 (W.D. Va. June 2, 2010) ("Decisions about when and how to intervene in an inmate fight are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." (internal quotation omitted)); *but see Montez v. United States*, 359 F.3d 392, 398 (6th Cir. 2004) (opining that if a complaint alleged that "a prison guard stood by while an inmate was chased and severely beaten by 12 other inmates," it would likely "survive a motion to dismiss").

## B.    Eighth Amendment

Woodruff devotes the bulk of his opposition brief to the contention that the discretionary function exception to the FTCA does not apply here because his claims, although premised on state law, implicate his Eighth Amendment rights, and no government official enjoys discretion to violate the Constitution.  *See* Dkt. 55 at 7–13.  As Woodruff observes, the D.C. Circuit held in *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016), "that the FTCA's discretionary

---

[2] Woodruff also lodges an evidentiary objection to the Heath declaration, arguing that it "should be excluded under [Federal Rule of Evidence 602]," which requires "personal knowledge for non-expert testimony."  Dkt. 55 at 6.  This objection is not well taken.  Although Heath may not have personal knowledge about what occurred on the day of the attack, he does have personal knowledge about the procedures and daily operations at FCI Gilmer, which he "acquired . . . through the performance of [his] official duties," and it is those matters—not the attack—about which he testifies.  Dkt. 53-2 at 2 (Heath Decl. ¶ 3).

function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges . . . flouts a constitutional prescription." As the Court of Appeals explained, for the same reason "that the government has no policymaking discretion to violate 'a federal statute, regulation, or policy specifically prescrib[ing] a course of action for its employee to follow,' . . . the government lacks discretion to make unconstitutional policy choices." *Id.* at 944 (quoting *Berkovitz*, 486 U.S. at 536)). Congress, to be sure, did not waive the sovereign immunity of the United States for constitutional tort claims, but that limitation does not imbue *ultra vires* government action with the mantle of discretion or change the character of a common-law FTCA claim, which "provides a method to enforce state tort law against the federal government itself." *Id*. at 945.

Under *Loumiet*, then, the discretionary function exception does not shield conduct that the plaintiff has plausibly alleged violates the Constitution. The relevant question, therefore, is whether Woodruff has alleged facts or otherwise shown that the conduct that forms the basis of his claims crosses the constitutional line, thus divesting the correctional officers of any discretion they might otherwise have had. In conducting this analysis, the Court will address only Woodruff's claims that would otherwise be barred by the discretionary function exception: that is, his claims that the prison officials failed to intervene in the attack and delayed attending to his wounds for 20 to 25 minutes.

The Court notes at the outset that, unlike the government's argument about the applicability of the discretionary function exception, its arguments as to the plausibility of Woodruff's Eighth Amendment claims present a "facial" rather than a "factual" challenge to the Court's jurisdiction. The evidence offered by the government in support of its motion, the post orders and Heath declaration, is relevant only to how prison staff, in general, should respond to

the types of events at issue.  The government has not, however, offered any evidence that controverts Plaintiff's account of what actually occurred.  As a result, there is no factual dispute for the Court to resolve.  *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (holding that it is error to construe a motion to dismiss as a "factual attack" where the defendant has not "presented competing facts"); *cf. Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (observing that a moving part may convert its motion to dismiss into a factual attack "by presenting affidavits or other evidence properly brought before the court").  The government apparently agrees, and frames the question presented as whether Plaintiff has "plausibly plead[ed]" facts that "rise[] to the level of an Eighth Amendment violation."  Dkt. 57 at 7; *see also id.* at 11 (similarly focusing on the facial sufficiency of Plaintiff's allegations).  Framed in the manner, the Court must "apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Constitution Party*, 757 F.3d at 358.

1.  *Failure to Intervene*

The Court turns first to Woodruff's allegation that the prison officials failed to intervene in the attack. [3]  *See* Dkt. 55 a 10.  The Eighth Amendment requires prison officials to provide inmates with "humane conditions of confinement," and they must, accordingly, "'take reasonable

---

[3]  To the extent that Woodruff asserts a failure-to-protect claim based on the prison officials' failure to anticipate and to prevent the attack, that claim fails.  He has not alleged that the prison officials had any prior knowledge of a potential attack.  Instead, he alleges that even he had no "reason to fear for his safety in the recreation yard." Dkt. 52 at 2 (Am. Compl. ¶ 7).  Nor has he alleged any other facts from which the Court might infer that the prison officials were deliberately indifferent to a substantial risk prior to the attack.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (prison official is liable for failure to maintain a safe environment only if the official "knows of and disregards an excessive risk to inmate health or safety").

measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

(quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  Applying that principle, "lower

courts have uniformly held, and [the Supreme Court has] assumed [and later held], [that] 'prison

officials have a duty . . . to prevent prisoners from violence at the hands of other prisoners.'" *Id.*

at 833 (quotations and citations omitted).  Although the scope of that duty is not easily defined,

at least two circuits have recognized that the Eighth Amendment prohibits a correctional

officer's deliberate indifference to an "inmate-on-inmate" attack, including by failing reasonably

to intervene to stop or to limit the attack.  *See Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012)

(citing *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008)).  If a correctional officer, for

example, witnesses an attack, has a "'realistic and reasonable opportunity to intervene[,]' and

'simply refuse[s] to do so,'" his failure to act "'seemingly constitute[s] a paradigm case of

deliberate indifference.'" *Id.* (citations omitted).

      Here, the government does not dispute—at least for purposes of the pending motion—

that a correctional officer's failure to intervene to stop an inmate-on-inmate attack can, if

unreasonable, give rise to a plausible Eighth Amendment claim.  Rather than engage on that

ground, the government merely argues that Woodruff does not plausibly alleged that FCI Gilmer

prison staff had "sufficient time to safely intervene to stop the fight before it ended."  Dkt. 57 at

7–8.  That contention is unpersuasive.  Plaintiff alleges that the attack was "long-lasting," that he

suffered several "puncture wounds," and that it involved a struggle in which Plaintiff had "to

wrest the knife from his . . . assailant."  Dkt. 52 at 3–4 (2d Am. Compl. ¶¶ 11–12, 15); *cf. Harris*

*v. Westchester Cty. Dep't of Corr.*, No. 17-cv-839, 2019 U.S. Dist. LEXIS 178392, at *35

(S.D.N.Y. Sept. 23, 2019) (holding that a reasonable jury could conclude that the officers had the

opportunity to intervene in an inmate fight even though the officers claimed that "the altercation

lasted approximately 15 seconds"). He also alleges that he "shouted and gestured toward [the] correctional officers assign[ed] to the recreation yard, without response," Dkt. 52 at 3 (2d Am. Compl. ¶ 11), that the officers were "close enough to . . . hear[] Plaintiff shouting and would have seen Plaintiff being assaulted," *id.*, and that they nonetheless "paid no attention to the . . . attack," *id.* at 4 (2d Am. Compl. ¶ 15). Taking these allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must do at this stage of the proceeding, *Settles*, 429 F.3d at 1106, it is at least plausible that the prison staff knew that an assault was occurring and opted simply to ignore it.

The government is, of course, correct that "[a] prison guard is not required to place himself in the danger of physical harm when two inmates are engaged in a fight." Dkt. 57 at 8 (quoting *Lacy v. Berge*, No. 96-1932, 1997 U.S. App. LEXIS 35827, at * 3 (7th Cir. Dec. 17, 1997)); *see also Arnold v. Jones*, 891 F.2d 1370, 1373–74 (8th Cir. 1989) (holding that outnumbered and unarmed officers were not required to physically intervene in a violent fight between inmates). But that does not answer the question whether there was something the officers could have—and should have—done to at least attempt to protect Plaintiff from a violent, and potentially lethal, attack. *MacKay v. Farnsworth*, which the government relies on, is illustrative. 48 F.3d 491 (10th Cir. 1995). There, the court concluded that the prison guards were not deliberately indifferent because they had taken steps to abate the risk that the plaintiff faced, such as "attempting to break up the fight verbally" and calling "for additional staff and medical personnel." *Id.* at 493 (finding no deliberate indifference because the measures taken "were reasonable"); *see also Harris*, 2019 U.S. Dist. LEXIS 178392, at *37 (holding that it was a question of fact whether the officers "verbally telling the inmates to stop fighting was a reasonable response"). Here, in contrast, Plaintiff alleges that the prison officials took no steps

18

to respond to the attack and, instead, simply ignored his pleas for help.  Dkt. 52 at 4 (2d Am.

Compl. ¶ 14); *cf. Parker v. Mulderig*, 1993 WL 44275, at *13 (E.D. Pa. 1993) ("This is not a

case where a guard, aware of a risk, did nothing, or reacted too late to be of any help to the

plaintiff.").

 Because this claim plausibly states a violation of the Eighth Amendment, the government

cannot rely on the discretionary function exception at this early stage of the proceeding.

 2. *Delayed Medical Treatment*

 Woodruff also alleges that prison officials exceeded their constitutional authority by

failing to attend to his wounds until 20 to 25 minutes after the attack.

 In *Estelle v. Gamble*, the Supreme Court recognized that the Eighth Amendment

"embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency,

against which [courts] must evaluate penal measures."  429 U.S. 97, 102 (1976) (quotations

omitted).  Consistent with those principles, *Estelle* held that the Eighth Amendment proscribes

the "unnecessary and wanton infliction of pain," even when the indifference is manifest by

"prison guards . . .  intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed."  *Id.* at 104.  That is not to say "that every claim

by a prisoner that he has not received adequate medical treatment states a violation of the Eighth

Amendment."  *Id.* at 105.  "[A]ccidental or inadvertent failure to provide adequate medical care"

does not violate the Eighth Amendment; instead only "deliberate indifference" that "constitutes

unnecessary and wanton infliction of pain contrary to contemporary standards of decency"

violates the Eighth Amendment.  *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle*,

429 U.S. at 104).  To strike this balance, courts have developed a two-part test an incarcerated

person must satisfy to establish an Eighth Amendment claim based on an alleged delay in

providing medical care.  First, the court must consider whether the person "suffered from an objectively serious medical condition," and second, it must examine whether the "defendant was deliberately indifferent to that condition."  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc), *as amended* (Aug. 25, 2016) (citing *Farmer*, 511 U.S. at 834); *see also Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) ("To show deliberate indifference, [a plaintiff must] allege that [the defendant] had subjective knowledge of [a] serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk.").  As explained below, the Court concludes that Woodruff has failed to allege facts sufficient to satisfy this two-part test.

Citing to cases from the excessive force context, Plaintiff argues that the injuries he suffered were "not *de minimis* and are . . . sufficient to sustain [his] claim."  Dkt. 55 at 8.  The problem with this argument is that the Supreme Court has distinguished the showing a plaintiff must make in the medical needs context from the showing that suffices in the excessive force context.  In *Hudson v. McMillian*, which Woodruff quotes at length, Dkt. 55 at 9, the Supreme Court explained that "[t]he objective component of an Eighth Amendment claim . . . is contextual and responsive to 'contemporary standards of decency,'" 503 U.S. 1, 8 (1992) (quoting *Estelle*, 429 U.S. at 97).  In the medical-needs context, the Court further explained, society does "not expect prisoners will have unqualified access to health care," and so a violation exists only if the prisoner's "needs are 'serious.'"  *Id.* at 9 (quoting *Estelle*, 429 U.S. at 103–04). In the excessive force context, in contrast, "society's expectations are different" and a plaintiff may state a claim "whether or not significant injury is evident," *id.*  Because Plaintiff's delay-in-treatment claim is not premised on an excessive force theory, his reliance on the *Hudson* line of cases is inapt.

The government's description of the relevant legal standard is closer to the mark but fails to wrestle with the split in authority—and the absence of controlling D.C. Circuit case law—regarding what it means for a prisoner to have a "serious medical need." *Estelle*, 429 U.S. at 104. As the D.C. Circuit has observed, "the task of discerning what constitutes a 'serious medical need' under *Estelle* may prove vexing at the margins." *Brown v. District of Columbia*, 514 F.3d 1279, 1284 (D.C. Cir. 2008). In the government's view, the test is straightforward: the plaintiff "must not only plausibly allege a delay in treatment but also that the delay had a detrimental effect on his medical condition that was sufficiently 'serious' to rise to [a] violation of constitutional proportions." Dkt. 57 at 10 (citing *Martinez v. Maverick Cty.*, 507 Fed. App'x 446, 448 (5th Cir. 2013)). In other words, it doesn't matter how severe the injury is or how urgently the prisoner requires medical attention, as long as the prisoner is ultimately fortunate enough not to suffer any serious, detrimental effects to his health as a consequence of the delay.

The government, however, fails to address a separate line of cases that have employed an "obviousness" test, which posits that a "medical need" is objectively "serious" if it is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Dadd v. Anoka Cty.*, 827 F.3d 749, 755 (8th Cir. 2016) (quoting *Vaughn v. Greene Cty.*, 438 F.3d 845, 851 (8th Cir. 2006)); *see also Scozzari v. City of Clare*, 597 Fed. App'x 845, 849 (6th Cir. 2015) (same); *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011) (same); *but see Gottke v. Winn Corr. Ctr.*, 789 Fed. App'x 479, 480 (5th Cir. 2020) ("A delay in medical care violates the Eighth Amendment only if it is due to deliberate indifference resulting in substantial harm."); *Requena v. Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018) (same). Other decisions hold that the obviousness test and the effects-based test, which the government advocates, are equally valid but apply to distinct types of alleged medical needs. *See, e.g.*, *Blackmore v. Kalamazoo*

*Cty.*, 390 F.3d 890, 897–900 (6th Cir. 2004); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). And still other courts have taken a more holistic approach. As the Sixth Circuit has observed, "[w]hether a prisoner has suffered unduly by the failure to provide medical treatment is to be determined in view of the totality of the circumstances," including "the practicalities of the situation," "the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention" *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)); *see also Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("[T]he serious need inquiry must be tailored to the specific circumstances of each case.").

Whichever test applies, Woodruff's complaint does not allege facts sufficient to conclude that the officers who were present had the required "subjective knowledge of [Woodruff's] serious medical need," *Baker*, 326 F.3d at 1306, no matter how "serious medical need" is defined. He does, to be sure, allege that the officers were "close enough to . . . have heard [him] shouting and [to] see [him] being assaulted." Dkt. 52 at 3 (2d Am. Compl. ¶ 11). But the key question with respect to this claim is not whether the officers saw that he had been assaulted but, rather, whether Woodruff has alleged facts sufficient to support a plausible inference that the officers knew that he had suffered serious injuries or that he was "bleeding profusely." *Id.* at 4 (2d Am. Compl. ¶ 14). On this question, his complaint is silent. Plaintiff does not allege that the officers knew that he had gone into shock or that, if not attended to, he might do so. He does not allege that the officers knew that he was "experience[ing] . . . great pain" or "emotional distress." *Id.* at 5 (2d Am. Compl. ¶ 20). And, most significantly, he does not allege that the officers observed that he had been stabbed or otherwise injured in the assault. Instead, he merely alleges that the officers "would have seen [him] being assaulted." *Id.* at 3 (2d Am. Compl. ¶ 11). This

leaves the Court to speculate whether the officers, although close enough to witness the attack, could see that Plaintiff had been injured and, if so, whether they were aware of the extent of his injuries.  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Thus, although Woodruff's allegations are sufficient to support the inference that the officers knew that an assault was occurring, he has not alleged sufficient facts to support the inference that they knew that he was in need of prompt medical attention.

Although Woodruff does not join issue on the question whether the prison officials were aware of the extent of his injuries, the Court notes that one allegation contained in the introduction to the complaint does allege that the officers had "actual knowledge that Plaintiff was exposed to a substantial risk of serious harm from [the] assault." *Id*. at 1 (2d Am. Compl.). That allegation, however, is insufficient to fill the void for two reasons.  First, the allegation is "conclusory" and thus not entitled to the assumption of truth that typically governs on a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  Second, it does not distinguish between knowledge of the "substantial risk" posed by the assault itself, which Plaintiff does allege with sufficient specificity, and knowledge of the nature and extent of the injuries he sustained, which Plaintiff says nothing about in the remainder of the complaint.  As the government notes, it is telling that Plaintiff alleges that the officers could see the assault and that he called for help as it was occurring but that he neither alleges that he called for help nor that he was physically unable to do so after the assault occurred.  Instead, he merely alleges that he was found "sitting in the yard" 20 to 25 minutes after the assault occurred.  Dkt. 52 at 4 (2d Am. Compl. ¶ 14).

23

The objective and subjective prongs of the *Estelle* deliberate indifference to a serious medical need test are necessarily linked.  The need for medical care must be objectively serious, and the prison officials must be subjectively aware of *that* need.  *See Majhor v. Kempthorne*, 518 F. Supp. 2d 221, 239 (D.D.C. 2007) (holding that without "actual knowledge" of the plaintiff's injuries, the defendants "could not have deliberately sought to withhold care for a serious medical need or ignored [the plaintiff's] requests for medical care" (quoting *Arnold v. Moore*, 980 F. Supp. 28, 34 (D.D.C. 1997)).  Here, however a "serious medical need" is defined, the complaint fails to allege facts indicating that the correctional officers knew that Woodruff was in need of immediate medical attention.  As a result, with respect to this portion of his FTCA claim, Woodruff has failed plausibly to allege that the failure to attend to his wounds more promptly "exceeded the scope of [the officers'] constitutional authority so as to vitiate discretionary-function immunity." *Loumiet*, 828 F.3d at 946.

The Court will, accordingly, dismiss Plaintiff's delayed medical treatment claim without prejudice.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, Dkt. 53, will be **GRANTED** in part and **DENIED** in part.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

June 18, 2020